CREED A. DANIEL AND MURIEL H. DANIEL, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Daniel v. Commissioner
Docket No. 32157-84.
United States Tax Court
T.C. Memo 1987-304; 1987 Tax Ct. Memo LEXIS 304; 53 T.C.M. (CCH) 1166; T.C.M. (RIA) 87304; June 22, 1987. Glen R. Claiborne, for the petitioners. Gary F. Walker, for the respondent. KORNER
MEMORANDUM FINDINGS OF FACT AND OPINION KORNER, Judge: Respondent determined the following deficiencies in and additions to petitioners' Federal income tax: Tax Year
Addition to
Ended
Deficiency
Tax Sec. 6653(b) [1]
December 31, 1979
$109,675.87
$54,837.94
December 31, 1980
2,307.73
After concessions, [2] the issues remaining for decision are: (1) Whether petitioners realized a $116,033.20 long-term capital gain in 1979 from the sale of an office building located in *306 Oak Ridge, Tennessee; (2) whether petitioner realized a long-term capital gain in 1979 in the amount of $85,875 from the sale of stock of the City and County Bank of Knox County, Tennessee; [3] (3) whether petitioner incurred deductible interest expense of $57,383.33 during 1979; (4) whether petitioners are liable for an addition to tax pursuant to section 6653(b) for 1979; and (5) whether petitioner Muriel H. Daniel is entitled to relief from liability for 1979 in accordance with the provisions of section 6013(e). FINDINGS OF FACT Some of the facts have been stipulated and are so found. The stipulation of facts and exhibits attached thereto are incorporated herein by this reference. Background
Petitioners Creed A. Daniel and Muriel H. Daniel, [4] husband and wife, resided in Rutledge, Tennessee, at the time they filed their petition herein. Petitioners filed joint Federal income tax returns for the taxable years 1979 and 1980 using the cash method of accounting. *307 At the time of trial, petitioners had been married for over 30 years. During the year in issue, petitioner was an attorney who practiced law in Rutledge, Tennessee. Mrs. Daniel was employed as a legal secretary during the first eight years of the marriage, and she was a housewife with her husband as her sole source of support in 1979. During 1979, petitioner served on the board of directors for each of the City and County Banks located in Jefferson County, Knox County, Hawkins County, and Union County, Tennessee. He also served on the board of directors of Southern Industrial Banking Corporation and United American Bank of Washington County, Tennessee. During that same year he owned stock in Radioak, Inc. ("Radioak"), a corporation engaged in radio broadcasting. The Oak Ridge Office Building
On March 4, 1975, Jerome F. Salomone, president of Kingston Pike Realty, Inc. ("Kingston Pike"), sold an office building located in Oak Ridge, Tennessee (the "Oak Ridge Building" or the "building") to petitioners. The instrument of conveyance used was a warranty deed whereby Kingston Pike: granted, bargained, sold and conveyed, and do hereby grant, bargain, sell and convey unto *308 the said Second Parties [petitioners] the following described premises to wit: [a legal description of the property] * * *. Petitioner stated in the deed under oath: I, or we, hereby swear or affirm that the actual consideration for this transfer or value of the property transferred, whichever is greater, [is] $185,000.00, which amount is equal to or greater than the amount which the property transferred would command at a fair and voluntary sale. /s/ Creed A. Daniel, Affiant The building was financed using a promissory note signed by petitioner on March 4, 1975, in which he promised to pay to the City and County Bank of Anderson County $185,000 in 11 monthly installments beginning April 1, 1975, and continuing until March 1, 1976, at an annual interest rate of 9 percent. To collateralize the note, on March 31, 1975, petitioners signed a deed of trust on the property for $185,000 in favor of the City and County Bank of Anderson County. [5]
Petitioners reported the following items with respect to the Oak Ridge Building on their Federal income *309 tax returns for the following years: [6]
Taxable Year
Item
1975
1976
1977
1979
Income (Rents)
$ 6,204.30 $29,254.00
$6,605.00 Expenses: Depreciation (Straight
line based on a $185,000
cost basis and a 20-year
useful life)
[7] 9,450.00 9,250.00 9,250.00
3,083.00 Interest on Note
9,712.50 [8]
14,372.00
n8
Other Expenses
4,791.00 Net Income (Loss)
($12,958.20)
($9,250.00)
$5,632.00
($1,269.00)
On May 21, 1979, petitioners sold the Oak Ridge Building to Radioak. The instrument of conveyance used was a warranty deed whereby petitioners: Have granted, bargained, sold and conveyed and do hereby grant, bargain, sell and convey unto *310 the said second parties [Radioak] the following described premises, to wit: [a legal description of the property] * * *. The warranty deed was signed by petitioner and Mrs. Daniel. [9] John W. Pirkle, the president of Radioak, certified under oath on the deed that: I, or we, hereby swear or affirm that the actual consideration for the transfer or value of the property transferred, whichever is greater, is $440,000.00 which amount is equal to or greater than the amount which the property transferred would command at a fair and voluntary sale. Radioak financed the purchase by signing a promissory note dated May 21, 1979, promising to pay $440,000 to the City and County Bank of Anderson County. The note was secured by a deed of trust, the assignment of various leases, and the personal guaranties of petitioners. A closing statement prepared contemporaneously with the sale of the Oak Ridge Building reads, in pertinent part: Closing Statement
Radioak, Inc.
Funds Available: New Loan: City & County Bank of
Anderson Co., N.A.
$440,000.00
Use of Funds: Purchase of Building --
Total Price of $440,000.00 --
Payoff City & County Bank of
Anderson County, N.A./Creed
A. Daniel Loan
145,324.30
Balance Due Creed Daniel,
Trustee
294,675.70
*311 The property had been appraised at a value of $558,014.50 by realtor Gilbert Levison in a letter dated May 9, 1979. The minutes of a Radioak board of directors meeting on May 21, 1979, indicate that a plan was adopted on that date: To purchase the real estate leased by the corporation from Creed A. Daniel, et ux, and C. H. Butcher, Jr. Consideration will be $440,000.00 of which approximately $145,000.00 will be paid by assuming Mr. Daniel's note and the balance of approximately $295,000.00 to be paid to Mr. Butcher for his interest in the building and any consultation work he had done for the corporation in the past. Petitioners did not report the sale of the Oak Ridge Building on their 1979 Federal income tax return. On Mr. Butcher's income tax return, however, the following item appears in an attachment to Schedule D of Form 1040: Date
Date
Sales
Kind of Property
Acqrd
Sold
Price
Cost
Gain
Radioak, Inc.
Building
3-4-75
3-29-79
$440,000
$145,324
$294,676
In his statutory notice of deficiency, dated June 28, 1984, respondent determined, inter alia, that petitioners failed to report for the 1979 taxable year a long-term capital *312 gain of $116,033.20 from the sale of the Oak Ridge Building, computed as follows: Sales Price
$440,000.00 Add: Depreciation Allowed
35,083.00 Subtotal
$475,083.00 Less: Cost
(185,000.00)
Gain on Sale
$290,083.00 Sec. 1202 Deduction
174,049.80 Reportable Gain
$116,033.20 At the time he was initially contacted by respondent's revenue agent, petitioner told the agent that no income was omitted from petitioners' 1979 income tax return. Petitioner also told the agent that he had not sold any real estate during 1979. The agent researched the matter further and discovered the warranty deed for the sale of the building by petitioners. When presented with this information, petitioner, through his accountant, informed the agent that he realized only $134,906.54 from the sale of the Oak Ridge Building and thus incurred a loss on the sale of $30,010. [10] At the final meeting with respondent's agent, petitioner indicated, for the first time, that he held the building merely as a nominee and was not the true owner. *313 The Knox Bank Stock Sale and the Interest Deduction
Petitioner was one of the founders and a member of the board of directors of the City and County Bank of Knox County (the "Knox Bank"). At some point, the Knox Bank decided to issue additional stock to raise funds. On June 13, 1977, the Bank issued 180,132 shares of stock in petitioner's name that were allegedly to be sold later to other buyers. Using the stock as collateral, petitioner obtained a $2.2 million loan from United American Bank. The stock was sold later by petitioner sometime in April of 1979. As a result of the above transaction, on their 1979 Federal income tax return petitioners reported a long-term capital gain from the sale of 180,132 shares of Knox Bank stock as follows: Date Acquired
June 13, 1977
Date Sold
April 1979
Gross Sales Price
$2,285,875
Cost
2,200,000
Gain on Sale
$   85,875
Sec. 1202 Deduction
51,625
Reportable Gain
$   34,250
Petitioners also claimed a deduction for interest expense allegedly paid to United American Bank of $57,383.33. The interest payment, however, was never made by petitioners. The interest deduction was disallowed by *314 respondent in his notice of deficiency for the 1979 year. ULTIMATE FINDING OF FACT Petitioner fraudulently underpaid at least part of his income taxes due for the taxable year 1979. OPINION The Sale of the Oak Ridge Building
The first issue for decision is whether petitioners realized a $116,033.20 long-term capital gain in 1979 from the sale of the Oak Ridge Building. Petitioners contend that they acquired title to the Oak Ridge Building in name only and that the actual owner of the building was Radioak. Therefore, assert petitioners, they were not required to recognize a gain on the sale of the building since they were never the true owners for Federal tax purposes. Petitioners alternatively argue that even if they are considered the owners of the property, the transaction resulted in an overall loss. It is respondent's contention that petitioners were in fact the owners of the building for Federal tax purposes, and as such, they should have reported a gain on the sale. The documents prepared in connection with both the purchase and the sale of the building all indicate that petitioners were the owners of record during the period in question. The purchase documents, *315 consisting of a warranty deed, a promissory note, and a deed of trust, each list petitioners as the purchasers of the building. Similarly, the sale documents, consisting, inter alia, of a warranty deed and a closing statement, list petitioners and petitioner, respectively, as the vendor(s) of the property. The record also reveals that transfer taxes were paid both on the purchase and sale. Hence, by arguing that the transaction was a financing and that they were titleholders in name only, petitioners are now attempting to disavow the form of a transaction they structured. As we observed in Bolger v. Commissioner,59 T.C. 760, 767 n. 4 (1973): "the taxpayer may have less freedom than the Commissioner to ignore the transactional form that he has adopted." (Citations omitted.) See also Bradley v. United States,730 F.2d 718, 720 (11th Cir. 1984); Spector v. Commissioner,641 F.2d 376, 381 (5th Cir. 1981), revg. and remanding 71 T.C. 1017 (1979); Illinois Power Co. v. Commissioner,87 T.C. 1417, 1430 (1986). In Illinois Power relying on Comdisco, Inc. v. United States,756 F.2d 569, 578 (7th Cir. 1985), *316 we indicated that the taxpayer could not assert the priority of substance where its tax reporting and other actions did not show an honest and consistent respect for the substance of the transaction. On the facts of that case, we held, inter alia, that the taxpayer could not disregard a gift that had been characterized as such to various agencies and on its tax return. We reach a similar result on the facts before us. Petitioners' tax reporting and other actions have not shown a good faith and consistent respect for what they now contend to be the substance of the transaction. Rather, the facts reveal that petitioners have consistently characterized themselves as owners of the Oak Ridge Building. The purchase and sale documents all clearly indicate that petitioners alone were the sole owners of the property. More importantly, as our findings reveal, petitioners reported rental income from the property for 1975, 1977, and 1979; depreciation deductions for 1975, 1976, 1977, and 1979; and interest deductions on the note used to finance the building for 1975 and 1977. [11] These facts are clearly inconsistent with petitioners' current position, and it therefore cannot be said that *317 their tax reporting and other actions showed an honest or consistent respect for what they now consider to be the substance of the transaction, as is required by Illinois Power and Comdisco. Instead, the facts strongly support a finding that petitioners were the owners of the property. It is also significant that petitioner was intimately familiar with the financing used for both the acquisition and disposition of the building. Not only did he participate in his individual capacity as a purchaser when the building was initially acquired and as a seller when the building was ultimately sold, but he also participated in his capacity as a director and (at the time) majority shareholder of Radioak on the ultimate purchase of the building by that entity. In fact, Mr. Pirkle, the president of Radioak, testified that the financing for *318 the sale was all arranged by petitioner. [12] Likewise, we cannot ignore that petitioner was a member of the board of directors of no fewer than six banks. With this detailed knowledge of the intricacies of the financing involved in the purchase and sale of the Oak Ridge Building as well as of financial matters in general, we find it difficult to believe that petitioner would have reported himself as owner of the building for tax purposes if he honestly believed that the transaction was a financing arrangement. [13]
We find additional support for our holding in Groetzinger v. Commissioner,87 T.C. 533, 542 (1986), wherein we stated that: In applying the substance-over-form doctrine we are concerned with the intentions at the time of the agreement and economic realities as then perceived by the participants. * * * [Emphasis *319 added.] See Wager v. Commissioner,52 T.C. 416, 419 (1969). [14] In the instant case, the facts clearly show that at the time both the purchase and sale were structured, petitioners believed they were the true owners of the property. We accordingly conclude that petitioners will not be allowed to attack the form of their transaction to avoid the taxes that have resulted from it. As a result, petitioners will be treated during the period in question as the owners of the Oak Ridge Building for Federal tax purposes. We next turn to the amount of gain or loss that should have been reported on the sale. Respondent argues that the transaction produced a gain, calculated as follows: Amount Realized
$440,000 Adjusted Basis: Cost of Land and Building
$185,000 Less: Depreciation
(35,083)
Subtotal
149,917 Gain on Sale
$290,083 Petitioners, however, based on the following calculation, contend that a loss resulted from the transaction: Amount Realized: Debt Relief
$144,906.54 Less: Radioak stock given
up by petitioner in
connection with the
transfer
(10,000.00)
Subtotal
$134,906.54 Adjusted Basis: Cost of Building
$185,000.00 Less: Depreciation
(35,083.00)
Plus: Cost of Land
15,000.00 Subtotal
164,917.00 Loss on Sale
$ 30,010.46 *320 The burden of proving the correct amount of the gain is on petitioners. Welch v. Helvering,290 U.S. 111, 115 (1933); Rule 142(a). In this case, petitioners have failed to provide adequate evidentiary support for their position. Looking first to the amount realized on the sale we find that the warranty deed signed by petitioners as vendors and the president of Radioak as purchaser indicates that the consideration received for the transfer of the property was $440,000. Further support for the $440,000 amount realized figure is found in Radioak's promissory note in that the amount of the note was for $440,000, and in the closing statement which reveals that $440,000 was to be used to first pay off the outstanding balance of the note on the property and then the remainder was to accrue to petitioner. Thus, there is ample evidence in the record to bolster respondent's position. Petitioners, on the other hand, have provided us with little, if any, evidence to support their position that the only consideration received by them was debt relief and that they relinquished Radioak stock as part of the transaction. On this record, we therefore agree with respondent *321 and find as a fact that the amount realized on the sale was $440,000. [15]
We also agree with respondent's calculation of the adjusted basis of the property. The *322 evidence presented as to the original purchase price paid by petitioners for the building consists of a warranty deed and a promissory note. [16] Just above petitioners' signature on the warranty deed appears a statement indicating that the consideration given for the property was $185,000. This same amount appears as the amount borrowed in the promissory note. No evidence was presented as to the existence of a down payment or that any additional funds were used to purchase the property. Thus, using an original cost basis of $185,000 and depreciation of $35,083, [17] the resulting adjusted basis is $149,917. We consequently arrive at $290,083 as the gain realized by petitioners from the 1979 sale. [18]
*323 The Knox Bank Stock Sale and Interest Deduction
The second and third issues, whether petitioner realized a long-term capital gain in 1979 from the sale of the Knox Bank stock and whether petitioner incurred interest of $57,383.33, arise from the same transaction and are appropriately discussed together. The Knox Bank originally issued 180,132 shares of stock to petitioner on June 13, 1977. Apparently, based on his assurance that the stock was to be issued in his name, petitioner was able to obtain a $2.2 million loan from United American Bank. Although not made clear in the record, it seems that the proceeds of the loan were paid by petitioner back to the Knox Bank. The result of these dealings is that in 1979 the stock was sold by petitioner at a gain of $85,875 [19] and interest of $57,383.33 on the loan was deducted by petitioner in that same year despite the fact that it was never actually paid. Petitioner now claims that he was a party to this transaction in name only and that neither the gain nor the interest deduction should have been reported by him for Federal tax purposes. *324 Respondent disagrees, arguing that petitioner was the owner of the stock and thus should have reported the gain, and that the interest deduction was improper since it was never paid or incurred. Petitioner's argument is yet another attempt to attack the form of a transaction he devised. It appears that the transaction was structured as a sale with petitioner as the owner of the stock and it was reported as such on the return. Thus, the inconsistency between the ownership position petitioner took on his return and the nominee position he is now taking runs directly contrary to the previously discussed principles of Illinois Power and Comdisco.
The evidence presented in this case that petitioner was not the "true" owner of the stock for Federal income tax purposes has been entirely inadequate. [20] The only evidence tendered was petitioner's brief and self-serving testimony which we found to be very general and unconvincing. No documentary evidence was offered as to the distribution of the proceeds from the sale, whether there were any restrictions on the sale of the stock by petitioner, or as to the identity of the recipient of any dividends declared on the shares. Nor *325 was any other evidence offered as to the exercise of ownership rights, other than that suggesting that the shares were somehow used as collateral for a $2.2 million loan to petitioner or petitioners from United American Bank. We also find the nominee position to be somewhat inconsistent with the fact that the stock was held by petitioner for almost two years, and it is also significant that petitioner did not even know the reason the Knox Bank issued the stock in his name first before selling it to investors as opposed to offering them directly. [21]
*326 For all of these reasons we are of the opinion that it would be improper to disturb the stock sale as it was originally reported on the return. It is also clear that the claimed interest deduction of $57,383.33 must be disallowed, as petitioner admitted both at trial and on brief that the interest was never paid. The Fraud Addition
The fourth issue for decision is whether petitioners are liable for an addition to tax pursuant to section 6653(b). Section 6653(b), as in effect during the year at issue, provides in part that "If any part of any underpayment * * * of tax required to be shown on a return is due to fraud, there shall be added to the tax an amount equal to 50 percent of the underpayment." The elements of this section are thus twofold: (1) an underpayment and (2) that some part of this underpayment be due to fraud. Hebrank v. Commissioner,81 T.C. 640, 642 (1983). Respondent has the burden of proving each element by clear and convincing evidence. Sec. 7454(a); Hebrank v. Commissioner,supra; Rule 142(b). These elements need not, *327 however, be proven beyond a reasonable doubt. See Webb v. Commissioner,394 F.2d 366, 380 (5th Cir. 1968), affg. a Memorandum Opinion of this Court. In our opinion, respondent has proven that petitioners underpaid [22] their tax for 1979. As is more fully discussed above, the record clearly establishes that petitioners failed to report the gain from the sale of the Oak Ridge Building [23] and erroneously took an interest deduction that was never paid. [24] Our discussion at this point therefore focuses on whether these underpayments were due to fraud. *328 Fraud, as envisioned by section 6653(b), is the intentional commission of an act or acts for the specific purpose of evading a tax believed to be owed. Kotmair v. Commissioner,86 T.C. 1253, 1259 (1986). See Candela v. United States,635 F.2d 1272 (7th Cir. 1980); Stoltzfus v. United States,398 F.2d 1002, 1004 (3d Cir. 1968), cert. denied 393 U.S. 1020 (1969); Powell v. Granquist,252 F.2d 56 (9th Cir. 1958); Mitchell v. Commissioner,118 F.2d 308 (5th Cir. 1941); Wilson v. Commissioner,76 T.C. 623, 634 (1981), modified 77 T.C. 324 (1981); McGee v. Commissioner,61 T.C. 249 (1973), affd. 519 F.2d 1121 (5th Cir. 1975), cert. denied 424 U.S. 967 (1976). It is illustrated by a taxpayer's intent to conceal, mislead, or otherwise prevent the collection of such tax. Stoltzfus v. United States,398 F.2d at 1004; Webb v. Commissioner,394 F.2d at 377; Rowlee v. Commissioner,80 T.C. 1111, 1123 (1983); *329 Acker v. Commissioner,26 T.C. 107, 112-113 (1956), affd. in part, and revd. in part on other issues 258 F.2d 568 (6th Cir. 1958), affd. 361 U.S. 87 (1959). Fraud is a factual question to be determined on the basis of the entire record. Mensik v. Commissioner,328 F.2d 147, 150 (7th Cir. 1964), cert. denied 379 U.S. 827 (1964); Gajewski v. Commissioner,67 T.C. 181, 199 (1976), affd. without published opinion 578 F.2d 1383 (8th Cir. 1978); Otsuki v. Commissioner,53 T.C. 96, 105-106 (1969). Fraud can seldom be established by direct proof of the taxpayer's intent; therefore, the entire course of the taxpayer's conduct must be considered, and fraudulent intent can be established by circumstantial evidence. Spies v. United States,317 U.S. 492 (1943); Gajewski v. Commissioner,67 T.C. at 200; Stone v. Commissioner,56 T.C. 213, 223-224 (1971); Otsuki v. Commissioner,53 T.C. at 105-106. It is unnecessary for respondent to prove the exact portion of the income that was fraudulently unreported, *330 as section 6653(b) for the year at issue applies to the entire deficiency if any portion of it was due to fraud. Drybrough v. Commissioner,238 F.2d 735, 740 (6th Cir. 1956), affd. 23 T.C. 1105 (1955); Smith v. Commissioner,32 T.C. 985, 987 (1959). After considering the entire record, we hold that respondent has sustained his burden of proving fraud with respect to petitioner but not with respect to Mrs. Daniel. Our holding that petitioner's underreporting of income was due to fraud is based on the presence of a number of indicia of fraud that, taken together, constitute clear and convincing evidence of fraud. A discussion of those indicia follows. The omission of a substantial amount of taxable income is an indication of fraud. Holland v. United States,348 U.S. 121, 139 (1954). This is true even where only a single year is involved. See Meldon v. Commissioner,225 F.2d 467, 470, 473 (3d Cir. 1955). [25] Here, petitioner failed to report a $290,083 gain and erroneously deducted over $50,000 in interest *331 while reporting $170,000 of income. We consider the underreporting derived from these items to be evidence of fraud. Misrepresentations made to respondent's agents are indications of fraudulent intent. Grosshandler v. Commissioner,75 T.C. 1, 20 (1980); Beaver v. Commissioner,55 T.C. 85, 93 (1970). In the instant case, petitioner repeatedly changed his explanation concerning the sale of the Oak Ridge Building. He initially told respondent's agent that he had not sold any real estate during 1979. When confronted with the warranty deed, however, through his accountant, he then claimed that there was in fact a sale, but that the sale resulted in a loss. He finally decided that a sale did not really take place, but instead, he was holding the property as a nominee. These inconsistencies together with petitioner's admitted false interest deduction provide further *332 evidence of fraudulent intent. Notwithstanding the above, petitioner argues that the underreporting and erroneous deduction were the fault of a Mr. Ted Erck, who petitioner claims to have prepared his 1979 return. While we have, on occasion, held that a taxpayer's reliance on an accountant to prepare income tax returns may indicate an absence of fraudulent intent, see, e.g., Marinzulich v. Commissioner,31 T.C. 487 (1958), this is not such a case. The return in issue was not signed by a return preparer nor was Mr. Erck called to testify at trial. Moreover, we cannot ignore that petitioner was an attorney/banker with wide and extensive financial experience and business acumen. See and compare Powell v. Granquist,252 F.2d 56 (9th Cir. 1958), with Marinzulich v. Commissioner,supra.
In sum, we are of the opinion that petitioner's acts and omissions were part of a pattern of action conceived and implemented by petitioner to underreport his Federal income tax liability and mislead respondent. We accordingly uphold respondent's section 6653(b) determination against petitioner for 1979. We do not reach the same result, *333 however, concerning Mrs. Daniel. While it is true that she signed the returns, as well as the purchase and sale documents, and that she had acquired some business knowledge from her employment as a legal secretary, these facts are not tantamount to fraud. Respondent simply has failed to meet his burden of proving fraudulent intent by clear and convincing evidence on the part of Mrs. Daniel. Rule 142(b). He has not shown the concealment and deception that was shown on the part of petitioner. Rather than the result of fraud, Mrs. Daniel's actions might have stemmed from any number of plausible reasons such as carelessness or from marital deference to her husband. On these facts we conclude that Mrs. Daniel is not liable for the addition to tax under section 6653(b). Innocent Spouse Relief
The final issue that we must resolve is whether Mrs. Daniel is relieved from liability under the provisions of section 6013(e). Section 6013(e), [26] provides that a spouse who has filed a joint Federal income tax return may be relieved of liability for an underpayment of income tax if certain *334 reguirements are met. In order to qualify for relief under this so-called innocent spouse provision, the spouse must prove that: (1) A joint return was filed; (2) there was a substantial understatement of tax on the return attributable to grossly erroneous items of the other spouse; (3) he or she did not know or have reason to know of the understatement; and (4) taking into account all facts and circumstances, it is inequitable to hold him or her liable for the deficiency. Sec. 6013(e); Ratana v. Commissioner,662 F.2d 220, 224 (4th Cir. 1981); Sonnenborn v. Commissioner,57 T.C. 373, 380-381 (1971). The parties do not that dispute the first two requirements of section 6013(e) have been met. They disagree, however, as to whether there has been compliance with the latter two requirements. The standard to be applied for the *335 third requirement is whether the spouse knew or whether a reasonably prudent person, possessed of the same experience and temperament, would have known of the understatement of tax. Sanders v. United States,509 F.2d 162, 165, 167 (5th Cir. 1975); Terzian v. Commissioner,72 T.C. 1164, 1170 (1979); Mysse v. Commissioner,57 T.C. 680, 697-699 (1972). We are of the view that Mrs. Daniel reasonably should have known that the sale of the Oak Ridge Building produced a taxable gain. Her signature appears on the deed of trust used when the property was initially acquired, the warranty deed used when the property was sold, and on the 1979 income tax return. Mrs. Daniel was also a personal guarantor for the promissory note used by Radioak to finance its purchase of the building on May 21, 1979, and had at least some exposure to the business world in that she had worked for eight years as a legal secretary. Although she testified that she did not read the purchase or sale documents, or the return, she cannot close her eyes to "facts that might give her reason to know of the unreported income." Terzian v. Commissioner,supra at 1170; *336 Mysse v. Commissioner,supra at 699. [27] As to the false interest deduction, Mrs. Daniel has failed to prove that knowledge of its falsity should not be imputed to her. Mrs. Daniel has similarly failed to establish the fourth requirement. We see no inequity in holding her liable for the determined deficiency. Other then her own self-serving testimony, she has not produced any evidence to support her claims that she did not significantly benefit as a result of the underreporting [28] or that there was no change in her standard of living. [29] On these facts we conclude that Mrs. Daniel is not entitled to the benefits of section 6013(e) but remains jointly and severally liable for the deficiency in tax. Sec. 6013(d)(3). *337 To reflect the foregoing, Decision will be entered under Rule 155.
Footnotes
1. All statutory references are to the Internal Revenue Code of 1954, as in effect in the year in issue, and all Rule references are to the Tax Court Rules of Practice and Procedure, except as otherwise noted.↩
2. Petitioners no longer dispute the deficiency for the 1980 tax year. ↩
3. This issue was first raised by petitioners in their petition, filed September 10, 1984.↩
4. For purposes of convenience, when addressing petitioners individually we will hereinafter refer to Creed A. Daniel as petitioner and Muriel H. Daniel as Mrs. Daniel.↩
5. A state transfer tax of $481 and a state mortgage tax of $83 were paid to Anderson County as a result of the sale.↩
6. The parties were unable to locate the 1978 return. ↩
7. This figure apparently is the result of a mathematical error, as the basis of the building ($185,000) divided by the expected useful life (20 years) yields annual depreciation of $9,250. ↩
8. Petitioners did not separately allocate an interest deduction to the note for 1976 or 1979 as they did for 1975 and 1977. They did, however, deduct $16,268.39 in 1976, and $36,420.29 in 1979 as investment interest expense.↩
9. A state transfer tax of $1,144 was paid to Anderson County as a result of the sale.↩
10. This figure appears in a memorandum prepared by petitioner's accountant, William E. ("Bill") Long, and apparently is the result of calculations which we may summarize as follows: Amount Realized
Debt Relief
$144,906.54 Less: Radioak Stock given
up by petitioner in
connection with the
transfer
(10,000.00)
Subtotal
$134,906.54 Adjusted Basis
Cost of Oak Ridge Building
$185,000.00 Less: Depreciation
(35,083.00)
Plus: Cost of Land
15,000.00 Subtotal
164,917.00 Loss on Sale
$ 30,010.46 Although the $15,000 figure appears as the cost of the land in the memorandum, the record does not reveal that this amount was actually paid by petitioners as part of the acquisition price of the property.↩
11. As is indicated in our findings, the parties were unable to locate the 1978 return. Further, although petitioners did not separately allocate interest to the note used to purchase the building for 1976 or 1979, as they did for 1975 and 1977, they did claim deductions for investment interest of $16,268.39 in 1976 and $36,420.29 in 1979.↩
12. We found petitioner's self-serving testimony that the financing for the Oak Ridge Building was done "completely by the bank" to be unreliable. ↩
13. Although petitioner claimed that his 1979 return was prepared by an accountant, the return was not signed by a preparer, nor was the alleged return preparer called to testify.↩
14. See also Emmer v. Commissioner,T.C. Memo. 1978-102↩.
15. We do note, however, that minutes from a Radioak board of directors meeting indicate that $440,000 was to be paid by assuming the outstanding balance of petitioners' note (approximately $145,000) and the remaining amount (approximately $295,000) was to be paid to Mr. Butcher "for his interest in the building and any consultation work he had done for [Radioak] in the past." As we have found, however, petitioners were the sole owners of the building, and it bears emphasizing that no documentary evidence, other than the minutes, was offered by petitioners to support a finding that Mr. Butcher held an ownership interest in the building or performed any services for Radioak. Nor was any evidence offered to indicate the amount of the alleged interest. As such, even if part of the sales proceeds were paid to Mr. Butcher, as petitioners were the sole owners of the building, the proceeds were entirely taxable to them under the assignment of income doctrine. See Lucas v. Earl,281 U.S. 111↩ (1930).
16. A memorandum prepared in 1982 by petitioners' accountant, Mr. Long, appears to indicate that the purchase price of the building, was $200,000 -- using $185,000 as the value of the building and $15,000 as the value of the land. We accord this document little or no weight primarily for four reasons: (1) The only documents presented in connection with the sale were the warranty deed and the promissory note, each of which indicates that $185,000 was the purchase price of the property; (2) no evidence as to the existence of a down payment was proffered; (3) Mr. Long was not petitioners' accountant at the time of the original purchase in 1975 and did not become their accountant until 1981; and (4) at trial, Mr. Long testified that the $15,000 figure was "just surmis[ed] for the sake of discussion * * *." ↩
17. We realize that $185,000 was used as the basis figure for the building for purposes of computing depreciation. In light of our finding that the purchase price of the property (i.e. both the land and building) was also $185,000, it would appear that the basis figure should have been adjusted downward to reflect an estimated value for the land. However, neither party has contested the amounts deducted for depreciation for the year before us. ↩
18. After taking into account the sec. 1202 deduction, the reportable gain is $116,033.20.↩
19. The calculation of sales price, basis, and gain are not disputed by the parties.↩
20. The identity of the tax owner of property is a factual determination requiring an examination of each particular case. See, e.g., Schoenberg v. Commissioner,302 F.2d 416 (8th Cir. 1962), affg. a Memorandum Opinion of this Court; Snyder v. Commissioner,66 T.C. 785 (1986); Beran v. Commissioner,T.C. Memo. 1980-119; Connelly v. Commissioner,T.C. Memo. 1975-328. The burden of proof, of course, is on petitioners. Welch v. Helvering,290 U.S. 111, 115↩ (1933); Rule 142(a).
21. At trial, the following colloquy took place: THE COURT: What was the purpose, Mr. Daniel, of putting [the stock] in your name in the first place; if the bank had a new issue of stock that it wanted to sell, why did it have to put it in your name and have you resell it, why could they not just sell it to the purchasers direct? THE WITNESS: Your Honor, what I was stating is that I am not for sure as to how much was the new issue. There was some other stock that was owned by individuals who were not making their payments or who could not service their debt, and then it was placed all into one fund, so as to get it out in the name of someone that could service the debt. THE COURT: Well, my question stands. Why did not the bank just take the stock in in its own name and resell it to whoever, why did they have to put it in your name? THE WITNESS: I do not know, sir. I cannot answer that.↩
22. An "underpayment" is defined in sec. 6653(c) in essentially the same manner as "deficiency," which in turn is defined in sec. 6211↩, as the amount by which the tax imposed exceeds the amount of tax shown on the taxpayer's return. 23. Accepting, arguendo, petitioners' position that they were not the true owners of the building, their knowing claim of depreciation expenses from a building they did not own would clearly result in an underpayment of tax. ↩
24. As our textual discussion reveals, this is not a case -- at least with respect to these two items -- where respondent is relying on petitioner's failure to carry his burden of proof as to the underlying deficiencies. See Habersham-Bey v. Commissioner,78 T.C. 304, 312↩ (1982). Petitioners admitted that they never paid the interest, and affirmative evidence in this record shows that they were the owners of the Oak Ridge Building.
25. See also Black v. Commissioner,T.C. Memo. 1987-212↩ (taxpayer's omission of almost $50,000 while reporting only $14,469.64 is "strong evidence of his fraudulent intent").
26. Sec. 6013(e)↩ was amended by the Tax Reform Act of 1984, Pub. L. 98-369, sec. 424(a), 98 Stat. 801 (1984-3 C.B. (Vol. 1) 309). Said amendment has retroactive application to all taxable years to which the Internal Revenue Codes of 1954 and 1939 apply. See H. Rept. 98-432, (Part 2) 1501, 1503 (1984).
27. In passing, we note that the spouse claiming to be relieved from liability for omission from income of an item must be unaware of the circumstances which gave rise to that omission and not merely to the tax consequences of the facts.Purcell v. Commissioner,86 T.C. 228, 238↩ (1986).
28. See sec. 1.6013-5(b), Income Tax Regs. We realize that these regulations were promulgated prior to July 18, 1984, the effective date of present sec. 6013(e), which no longer includes a specific reference to a significant benefits test. However, this factor is still to be taken into account. See H. Rept. 98-432, supra at 1502; DeMartino v. Commissioner,T.C. Memo. 1986-263↩ nn. 30 & 31. 29. It is likewise noteworthy that this is not a case where the husband and wife divorced subsequent to filing the joint return. Cf. sec. 1.6013-5(b), Income Tax Regs.; DeMartino v. Commissioner,supra.↩